**CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND**
**CIVIL DIVISION**

Greg Milton                          *
    Plaintiffs                    *        Civil No:
       v.                        *
                  *

Direct Merchants Bank,               *
Mann Bracken, LLC,                   *
Metris Companies, and HSBC Bank Nevada,  *
NA, fictitious names of named, and unknown  *
defendants,                          *
                  *

    Defendants.                      *
                  *

RECEIVED
JAN 31 2008
Clerk of the Circuit Court
Montgomery County, Md.

## COMPLAINT

## JURY DEMAND

**Nature of the Action**

    NOW COMES, Greg Milton, the Plaintiff, on his own behalf and on behalf of

other similarly situated consumers (hereinafter the "Plaintiffs" or "consumers"), brings

this action for injunctive and equitable relief, specific performance, and money damages

against Direct Merchants Bank ("DMB"), the Metris Companies ("Metris"), HSBC Bank

Nevada, N.A. ("HSBC"), and Mann Bracken LLC ("Mann Bracken") (the "Defendants").

The Defendants directed, controlled, and participated in the acts and omission referred to

herein in furtherance of their scheme to defraud the Plaintiff and other consumers through

fraudulent business practices.  On December 1, 2005, HSBC acquired Metris and DMB,

and is accordingly their successor in interest.  DMB was a wholly owned subsidiary of

Metris.  DMB has been since been dissolved as an entity.  HSBC Bank of Nevada, NA

operates HSBC's credit card business.  DMB is one of HSBC's many credit card brands.

HSBC took control of DMB's accounts and DMB became merely as a brand within

HSBC's credit card operation.  Prior to HSBC's purchase of DMB, the Plaintiff had

1

**EXHIBIT**

tabbies®

A

engaged DMB in a vigorous dispute concerning DMB's illegal business practices.
Among the various forms of DMB's illegal schemes, were unauthorized charges placed
on the Plaintiff's accounts by DMB in which cases DMB was the merchant, DMB's
refusal and failure to perform credit protection insurance services for which DMB was
again the merchant, and a litany of other fraudulent and erroneous billing practices.
Upon the initiation of the dispute, DMB, violated the Plaintiff's consumer rights, and
instead of researching the dispute, DMB began to sack the Plaintiff's credit by
demanding payment and compounding interest thereon the principal amount that was in
dispute.  DMB further reported the entire balance as delinquent to all of the credit
reporting agencies, and persisted to charge fees and interest.  The balance ballooned and
DMB, now under HSBC's name, claims that a balance is due.  The Plaintiff did not make
any transactions on the account ending in 3525 after he began to dispute DMB.
Likewise, the Plaintiff did not make any charges on the account ending in 8226 after
DMB suddenly closed the account in late January 2003 due to the Plaintiff's refusal to
quit the dispute and pay DMB inspite of DMB's failure to perform as promised.  Closing
the accounts and continuing to represents the accounts as charge-offs with outstanding
balances has and continues to injure the Plaintiff and his family economically and
psychologically.

      To accomplish this, DMB closed a second account held by the Plaintiff that was
in good standing to hurt his credit.  Further, DMB then ran up the balance on the This
action is meant to permanently enjoin the Defendants from engaging in fraudulent and
illegal practices in the operation of its credit card business under the federal and state
consumer protection laws of the United States and the District of Columbia.

2

DMB, in sometime in 2005, while engaged in a billing error dispute with the Plaintiff, and under an investigation led by the Comptroller of Currency of the United States, assigned the 8226 account to Mann Bracken. Mann Bracken is a debt collection law firm that routinely operates in the District of Columbia. Mann Bracken is a "debt collector" as that term is defined by 15 U.S.C. § 1692(a)(6) of the Fair Debt Collection Practices Act 15 U.S.C. § 1692, *et seq.* the ("FDCPA"). And that said, the Plaintiff is, and was at all times, a "consumer" as defined by 15 U.S.C. § 1692(a)(3) of the FDCPA. Mann Bracken has threatened, insulted, assaulted and generally impermissibly harassed the Plaintiff into submitting the fictional debt claimed due by DMB and now HSBC. More importantly, Mann Bracken, according to its documents, conspired with HSBC to falsify the debt by, but not limited to creating misleading and false court documents and committing perjury in an ongoing action in the District of Columbia Small Claims Court. Even more interestingly, Mann Bracken's attorney(s) deny HSBC involvement in the matter and still claims that DMB is an ongoing credit card concern unaffiliated with HSBC. HSBC took control of DMB's operations in full prior to Mann Bracken's appearance in the matter. Neither Mann Bracken, nor HSBC, responded to the OCC's investigation.

1.      The Defendants cannot directly or indirectly violate federal and state consumer protection laws. Second, DMB, Metris, and now HSBC, incorporate federal and state consumer protection laws into their cardmember agreements. That said, a violation of federal and state consumer protection laws is a breach of cardmember agreement. The Plaintiff's investigation and dealings with DMB revealed that DMB use false, fictitious, and erroneous accounting practices as pretext to superficially charge and collect

penalties, fees and high interest. Metris and DMB did so to further their profit motive. HSBC continues where Metris and DMB left off and seeks to entitle itself to revenue that was never earned and never due. To protect himself from DMB's fraudulent scheme of imposing improper charges on his credit cards, the Plaintiff repeatedly instigated billing error disputes with DMB. Upon doing so, the Plaintiff is afforded a right, under Federal law and the customer agreement, to withhold payment of the disputed amounts while DMB was precluded from trying to collect the disputed amounts, and reporting the Plaintiff as delinquent with respect to the same. See Regulation Z 12 C.F.R. § 226.13(a)(3) ("Reg Z") and under the DC Consumer Protection Act.

2.      But DMB simply ignored the Plaintiff's right to dispute. DMB's scheme was easy to notice, to say nothing of being blatantly dishonest. However, DMB made up for its lack of imagination by simply ignoring the Plaintiff's disputes and using the credit system to punish him economically for trying to stop the company's profit scheme.

3.      DMB neither satisfied its legal obligation under Reg Z, nor its professional obligation to examine its own accounting critically as DMB's accounting practices were seriously deficient.

4.      DMB fraudulently enrolled the Plaintiff in third party fee based membership programs that provided no actual service or benefit. The Plaintiff would instantly complain and demand that DMB remove the charges. DMB would, only re- enroll the Plaintiff back into these valueless programs against the request from the Plaintiff as if. The Plaintiff paid over $3000,, notwithstanding capitalized interest thereon, to DMB as premiums for a debt cancellation/ credit protection insurance program. However, when it was time for DMB to perform, DMB refused and has since been attempting to cover up

4

its breach of contract with all manner of excuses and fraudulent statements.  Moreover, even though DMB cannot dispute that it did not perform under its credit protection agreement, DMB also refuses to refund the unearned premiums.

5.      DMB controlled and operated all of its fee based programs.  Hence when accounting or information errors occurred, which they often did as DMB planted the errors , the Plaintiff had no recourse to cure the errors or resolves billing disputes since DMB was not going to police itself because the errors produced more revenue for DMB. When the Plaintiff refused to pay for errors and services he did not request, receive, or were of low quality, as was his right to do under the credit agreement and under federal consumer protection and banking laws, DMB improperly characterize the Plaintiff's accounts as delinquent.  Additionally, DMB charged the Plaintiff fees and "default" interest rates which were approximately over 30% when the Plaintiff was unemployed and unable to pay as retaliation for raising billing disputes.  DMB eventually closed the Plaintiff's account as retaliation and continues to impair the Plaintiff's credit today. DMB used harassing, abusive and illegal collection tactics to collect a debt that never existed.

6.      In retaliation for disputing its fraudulent and error prone business practices, DMB sought to ruin the Plaintiff economically. To date, the Plaintiff, as well as, his family, has lost over $200,000, notwithstanding incidental and collateral costs, due to the Defendants continual defamation of his credit as bad credit is like having Scarlett letter – which is terribly burdensome and expensive.  As such, the Plaintiff seeks immediate relief, a temporary restraining order and preliminary injunction order against DMB/HSBC, an

accounting from DMB/HSBC, and an order prohibiting DMB/HSBC from destroying or altering documents, and to disgorge ill-gotten gains with prejudgment interest thereon.

### Parties and Jurisdiction

7.     The Plaintiff is a natural person who resided in Maryland, New York and the District of Columbia during the relevant times herein.  The Plaintiff was also, at all times, a "consumer" under 15 U.S.C. § 1692(a)(3) of the FDCPA.  The Plaintiff entered into two opened ended consumer credit plan with DMB.  The first was under a Direct Merchants Bank card as it was prominently displayed.  The second was a Webmiles Card that later became a Travel Extras Card.  This card was not prominently marketed as a DMB card.

8.     DMB is a credit card company that was the wholly owned subsidiary of Metris Companies, a public traded company organized in Minnesota.  Metris was acquired by HSBC Bank in 2005.  Prior to its acquisition and dissolution by HSBC, DMB did offer its credit card services in the District of Columbia and across the nation.

9.     HSBC Nevada is also a banking concern.  HSBC took over control of Metris, DMB's parent company, in 2005.  DMB has offices in Maryland to collect payments and perform bill processing.  DMB has an "executive office" in Jacksonville, FL and collection practices in Oklahoma and Arizona. The Plaintiff has had dealings with DMB personnel in each of these offices.

10.    Defendant Mann Bracken is a law firm, a collection agency, and is a "debt collector" as that term is defined by 15 U.S.C. § 1692(a)(6) of the FDCPA.  Mann Bracken regularly undertakes collection actions in the District of Columbia under attorneys that are barred in the District.

6

### Statement of Facts

11.     When living and working in Brooklyn and New York City, NY in the late 1990's, the Plaintiff had a lucrative career and had amassed over $20,000 in savings. The Plaintiff sought out to purchase a home. However, due to his limited credit history he was unable to obtain a reasonable mortgage. Around the same time, DMB sent the Plaintiff a credit card offer that expressly represented that its credit card product was designed to improve its customer's credit profiles. That claim of course turned out not to be true due to DMB's deceptive and illegal business practices.

12.     In 2000, the Plaintiff applied and received a DMB Mastercard with a $3500 credit line.

13.     Also in 2000, the Plaintiff received a credit card offer from WebMiles. WebMiles was actually a DMB affiliate credit card. The Plaintiff did not know that he was opening up two credit cards with DMB. The credit line on that card was $3000.

14.     At the inception of the credit agreement the Plaintiff, requested DMB's "Account Protection Plus" ("APP"), a credit insurance product, and began paying premiums thereon. See ꙮ HYPERLINK "http://www.accountprotectionplus.com" ꙮwww.accountprotectionplus.comꙮ and Exhibit 1. Given the variable expense of open-ended credit agreements, opting to pay for APP was a prudent choice in the event that the Plaintiff should become unemployed for any reason.

15.     DMB's APP was credit insurance that specifically claimed to provide the Plaintiff with "peace of mind" in that DMB would protect the credit card accounts against the attendant risks of involuntary unemployment. That said, the APP was a valuable and

7

necessary service on its face. In reality, DMB never provided the APP service with a reasonable level of quality.

16.     DMB masked the true nature of APP. In most credit card insurance products, the credit card company itself is a third party and does not have control over the activation and delivery of the APP benefit. In DMB's case, the APP product was under the sole control of DMB. Hence, in order for the APP concept to work, DMB would have to compel its collection department to cease its activities. DMB's unstated business model revolved around its collection process and as such DMB's APP program was subordinate to the collection process. So the APP program never operated as represented and DMB refused to question the quality of the APP program even the results are completely objective and not subject to opinion. The APP promised to protect the Plaintiff's credit card accounts, it did not. But DMB's failure to perform was not predicated by or due to any external event as DMB was in control of its collection processes and APP. DMB did not provide the APP service because it was not in its economic interest to do so as the APP service shut down DMB ability to charges interest and fees and collect revenue. DMB used a number of pretextual (some of which a totally specious) stories to explain why DMB did not provide the APP program, but still claiming it complied under its contract, and that the Plaintiff owed a debt to DMB for a service it never provided.

17.     DMB unilaterally placed charges on the Plaintiff accounts for illusory fee programs it controlled. By doing so, DMB increased the costs of debt and thereby automatically increased the premium for its APP. Sometimes, DMB would unwind the charge but not the percentage increase of the APP premium and therefore kept an ill-

gotten gain.  Amazingly, DMB as financial entity, its agents were woefully inadequately knowledgeable of how compound interest functions.

18.     In 2000 and 2001, DMB went from recording net revenues to realizing substantial gross and net losses.  This adverse effect on its balance sheet was the galvanizing cause to defraud its customers as DMB was facing bankruptcy if it could not a find a way to capture more revenues.  Breaching its APP contracts was a simple way to create accounting profits by running up the balance owed and reflecting that DMB was recording an accounting profit even though collecting the revenue was a remote possibility as customers like the Plaintiff could always refuse to pay for DMB's fraud.

19.     DMB operation of its APP program was sloppy and designed to produce errors that wiped out the very value of the APP program offered to the Plaintiff.  Under the APP, DMB promises not assess any fees, interest, or charges.  See ⌐ HYPERLINK "http://www.accountprotectionplus.com" ⌐ www.accountprotectionplus.com⌐.  However, DMB did not keep that promise as DMB assessed all three and then denied doing so in blatant contradiction with its billing statements.  DMB assessed compound interest rates in excess of 30% and has since claimed that the Plaintiff pay for such fees, along with the compound interest thereon.  And most remarkably DMB demands that the Plaintiff pay for the APP premiums which were supposed to prevent the fees or interest from accruing in the first place.  The Plaintiff disputed these events as billing errors, in writing and by fax, and has refused to pay for such a farce.  DMB did not respond in the manner required under the billing error dispute process under the Truth in Lending Act's Regulation Z Billing Error Provision – which happens to be stated, although in terribly small print, on the back of DMB's billing statements.  Most importantly, DMB in retaliation, began to

9

immediately report the Plaintiff as delinquent to the credit bureaus and demand the

Plaintiff to pay late fees and APP fees to remove the delinquent reports.  DMB would add

the late fees and APP premiums to the balance and charge 30% interest, compounded,

and demand payment.  DMB has done this to date and demands the Plaintiff to pay for

DMB's malfeasance and continues to hold the Plaintiff's credit hostage.

20.     DMB imposed charges and fees for customer assistance types of services like

requesting billing statements or processing payments over the phone.

21.     As explained in paragraph 13, DMB charged late fees and over the limit fees at

$30 per each instance, each month when the Plaintiff did not make a payment.  Under the

billing error provision, DMB is not permitted to include a disputed amount in the balance

from which the minimum payment was due.   Under the APP program, the entire balance

is protected and the Plaintiff was disputing the whole balance according to the APP

program.  DMB nonetheless added late fees to the Plaintiff's account ending in 3525.

Predictably, the balance on the account increased exponentially and DMB never

responded as required under Regulation Z.

22.     The Plaintiff contact the Comptroller of the Currency's Consumer Complaint

Division (the "OCC") to report the foregoing.  DMB took four months to respond and

provided a response that was not responsive in many material respects.  DMB merely

presented selective arguments that were not related to the dispute. The OCC does not take

an adversarial position in its dispute resolution process even though the OCC had found

DMB to have poor internal controls and engaging in fraudulent business practices during

the relevant time period.

23.    The cumulative effect of DMB's practice was to drive up its account receivables and then use the muscle of its collection process to bring in the revenue even though DMB did not earn the revenue. DMB's assessment of fees, interest, and charges for unrequested services, was designed to trap the Plaintiff in a vicious cycle of pyramiding debt and threaten his credit if he failed to pay.

## DMB's APP Program

24.    The APP program virtually provided no benefit to the Plaintiff. Despite the fact that DMB refused to provide the APP benefit, DMB still enrolled and charged the Plaintiff for its misleading and useless service. The Plaintiff stands in disbelief that DMB thinks it can hide or omit that it did not perform under the APP program and yet still demand a debt is due for its refusal to perform as if refusal is an accepted form of performance and that it is worth over $3000 notwithstanding the 30% interest rate attached which negatively amortized for nearly six years. At that rate, the Plaintiff's premiums are valued at more than $11,000 that he did not receive, notwithstanding the damage DMB did to his credit which is exceedingly greater the cost of DMB's breach of its contract.

25.    DMB advertised the APP program by stating that

"They say job security is a thing of the past. With APP your financial security doesn't have to be. After all, you've worked hard to build a life for yourself and your loved ones. That's why it's comforting to know, with APP your credit card account is protected. So whether you're just starting to build a career, or you're well established, APP can provided you with the added peace of mind you deserve." "APP is service offered by DMB for your credit card account…. The primary cardholder only, or both the primary and joint cardholders, may enroll in the service. A monthly fee will be charges to your account based on the monthly outstanding balance…:

- APP freezes your account for up to 12 months in the event you are involuntarily unemployed, provided all of the conditions are met, no monthly payment will be due and no finance, late or other miscellaneous charges will accrue….

11

**DMB's Illusory Services**

25.     DMB also enrolled the Plaintiff into various fee based memberships for retarded

emergency services like roadside help – the Plaintiff did not have a car, auto rental

insurance and fraud protection.

26.     DMB continued to enroll the Plaintiff into these phantom charges even after DMB

was well aware of the Plaintiff's disdain for being charged for services that were neither

requested nor any service or benefit received.

DMB's Abusive Collection Scheme.

27.     DMB treated the Plaintiff as a delinquent account holder in spite of the APP

program and persistently called him, his mother and grandmother with harassing, abusive

and misleading demands despite being told in writing to cease and desist.

28.     In April and May 2005, DMB called the Plaintiff at his employer although the

Plaintiff never provided the number.  In fact the business entity had just moved into the

location only shortly before.  The Plaintiff sent his dispute letters from the fax machine of

the firm.  DMB claimed that the number was provided by the Plaintiff to one of its

collection agents.  The Plaintiff did not provide the information and in April 2005, sent a

do not call letter via certified mail/receipt.  DMB called the Plaintiff after it received the

do not call letter on both his cell phone and at his job.  The DMB agent stated that I

provided the phone number to DMB.  That was not possible given that the law firm had

recently moved into the office and the internship had just began.  DMB simply lied to

cover its tracks.

29.     DMB's agents disregard its consumer's written and oral requests to stop calling

them.  DMB agents respond that they will continue to call until they obtain a payment.

DMB's practice of harassment is calculated to create such a disturbance in the life of their customer's that the customer will pay DMB to just to bring an end to barrage of calls. DMB promotes this aggressive practice even when DMB's faulty accounting practices are the reason why a customer's account is in collections in the first place. A customer's complaints are funneled to the collection department which will not investigate whether DMB is the party at fault or if DMB is plainly out of compliance.

30.     In September 2002, DMB increased the credit line to $3500. In its credit line increase disclosure, DMB stated that the Plaintiff's credit line was being increased because of his stellar payment history and valued him as a customer.

31.     At the same time, DMB was coloring the 3525 account, which the Plaintiff was actively disputing as delinquent. The Plaintiff was making payments on both accounts. However, the Plaintiff explained in his dispute letter that he would not pay for DMB's billing errors. In response, DMB began charging late fees and penalties on the 3525 account. The balance began to balloon out of control.

32.     The Plaintiff called non stop to demand DMB to behave honestly and with integrity. The 3525 account was closed and yet its balance was growing exponentially due to DMB imposes charges and interest, and the APP fees on top of it all.

33.     Yet, DMB refused to honor the APP program for the account. DMB claimed that the Plaintiff had not sent in the proper documentation to merit the benefit of the APP. However, DMB made no such claim on the 8226 account. DMB in fact did not make this claim until 2005. Three years after the Plaintiff had sought the protection of the Regulation Z billing error rights and the protective attributes of the APP for which the Plaintiff was being actively charged. DMB sought to avoid the spirit of the APP program

13

by producing the ridiculous and dishonest idea that DMB refusal was in fact performance and therefore DMB was entitled to keep all paid up premiums and any that would follow. Confusing indeed?

34.     The Plaintiff was contacted by a DMB employee in August 2002. She stated that she knew what happened to the Plaintiff's 3525 account, but could not do anything about it. She did however, resolve the errors on the 8226 account.

35.     The Plaintiff told DMB's collection the same and after December 2001 stopped making payments on the 3525 account because unless he paid the entire balance DMB would simply tack on penalty fees, interest and above all the APP fees, and then of course refuse to perform under the APP program.

36.     This sad circus went on for several months, when by mistake, the Plaintiff made a $150 payment on the 3525 account. DMB began calling with more regularity. In January, DMB called the Plaintiff on his cell phone demanding payment. The Plaintiff replied with profanity and indicated that the 8226 account was free and clear of error. That information alone should be a huge indication that DMB's records were in disarray. DMB in return, closed the 8226 account.

37.     Regulation Z prohibits DMB from making retaliatory attacks against consumers who dispute their bills in good faith. Second, DMB never instigated any collection activities with respect to the 8226 account as is was always in good standing. DMB closed the account to further harm the Plaintiff's credit which is more valuable than any one or two of his credit cards.

38.     As a result of the damage done to his credit by DMB, the Plaintiff has held all manner of odd jobs, used up his and worse, his family's savings to pursue his legal

14

education. DMB's assault on the Plaintiff's credit is precisely the kind of violence that is the concern of the consumer protection laws and fair lending statutes.

39.     In 2004, after failing to obtain private student loans due to DMB's fraud on his credit report, the Plaintiff's mother loaned him over $14,000 drawn from her IRA account. Since then, the Plaintiff's grandmother has co-signed on the Plaintiff's other loans and was offered an 11% interest rate due to DMB's fraud. The Plaintiff purchased a car and financed an 18% car loan thru Wells Fargo. As a result, the Plaintiff paid 200% for the car. Today, HSBC continues to perpetuate DMB's malfeasance on the Plaintiff's credit report and it ends now.

40.     In 2004, the Plaintiff reported DMB's fraud to the OCC. The investigation was halted when HSBC took over control of DMB. HSBC never responded to the OCC claim. In 2007, DMB instigated a claim in the small claims division of the District of Columbia's Superior Court.

41.     The OCC dispute revealed DMB's fraud even more so as DMB presented mutually exclusive and inconsistent responses. Moreover, the OCC investigation revealed that DMB manages its account information with manual end-user models. That said, if the original user made an error no one would ever detect or think to detect the error after the process moved to another DMB employee. Manual end user systems carry significant risk of error. As such the use of manual end user systems, should occur only with strong controls as an interim step to full automation. DMB's APP program was a manual end user system.

**DMB Incorrectly Calculated Interest Charges, DMB's Records Are Erroneous and Inconsistent to create the false pretense that it was due a debt, and Its Employees Did Not Understand The Structure/Operation Of Its Own Goods and Services**

42.     Many credit card companies spend vast resources to select capable finance professionals and to maintain and promote their employees understanding of finance. DMB on the other hand, employed a grossly incompetent staff that had little understanding of finance. The purpose was to maintain a controllable workforce that would not questions management's directives and not how to solve customer problems that were part of management's scheme to skim money for the consumer. Three years after the Plaintiff began to dispute DMB's business practices and the litany of billing errors across his accounts, DMB's Executive Response Committee, DMB's chief source of managerial acumen, began to issue a series of factually false, incoherent and technically inaccurate representations to respond to the Plaintiff's long over due disputes.

43.     Not withstanding, that DMB failed to respond to the Plaintiff's billing error dispute for over three years.  In late 2004, due to the regulatory pressure from the OCC, Ms. Wendy Cosme, Ms. Tracy Holland, and Ms. Deborah Holton and countless other DMB customer service agents began to issue a series of statements in response to an OCC investigation.  However, in all of the issued statements, DMB's agents could not agree on basic elements on how DMB's APP service worked, nor could they agree on the factual that underscored DMB's treatment of the Plaintiff's accounts.  Rather, in a two year investigation DMB completed a series of handoffs where different staff was assigned to the investigation.  Upon the introduction of each person, DMB's records materially changed and conspicuously contradicted DMB's previous statements. Meanwhile, the accounts were continually charged interest and fees and the disputed amount was never carved out of the outstanding balance as required under Reg Z.  This was essence of DMB's fraud as DMB played the both roles of player and referee.  And

16

predictably all referee calls went against the Plaintiff to drive up the score and the credit card balances in DMB's favor.

44.      In April 2005, DMB's Traci Holland and Deborah Holton, called the Plaintiff on his cell phone to discuss some accounting adjustments – charge backs/removing interest and fees from the 3525 account. In 2005, DMB began stating that it never received the Plaintiff's proof of unemployment with respect to the 3525 account, while conceding that it did have the same proof with respect to the 8226 account. DMB maintained this belief against fact, its record, common sense and the universal truth of corporate law – that information is imputed to the corporation itself and not to select employees.[1] DMB had refused to apply the APP benefit to the 3525 account. Yet for 25 billing periods, stemming from July 2002 to July 2004, DMB charged the Plaintiff's account for the APP benefit but refused to "protect the account" as promised under APP. DMB claimed that is was entitled to keep the charges for the APP credit protection service on the account although it also admitted that it refused to perform. Traci and Deborah indicated that refusal was a form of performance and that DMB had earned the APP premiums event though DMB had represented that the account was grossly delinquent, closed the 8226 account and had injured the Plaintiff's credit rating. They also conceded that, but for the APP premiums, the account would have had a zero balance based upon the Plaintiff's payment history. The Plaintiff feels that at certain point both Traci and Deborah

☐
[1] It is well established that information received and acknowledged by an employee of a corporation is imputed to the corporation itself. Consumers are not subject to deal with the inadequacies of a particular employee of the corporation. As if that were true, a consumer would face a never ending series of handoffs of accountability between employees and the corporation. That said, a given employee can't disclaim knowledge of an event or when the corporation itself has stated knowledge of the same event(s). Consumers do not contract with the corporation's employees but only the corporation. Hence, if an employee of a corporation acknowledges an event, another employee cannot disclaim ignorance of the same in order for the corporation to choose what story it prefers. This kind of mischief is precisely what internal controls are meant to police, detect, and deter.

17

recognized that they had "put their foots in their mouths" and had revealed that DMB did

was not concerned about having a good faith, let alone a credible position. Instead, they

implied that DMB was going to use its corporate muscle to force its hand with respect to

my accounts regardless of its legal obligations. At this point, Deborah Holton suggested

ending the call. In response, the Plaintiff, who vividly recalls standing in the hallway of

his law school's library, paused to ask Ms. Holton if she understood that her self-serving

decisions could not be defended in a court of law. Ms. Holton replied that she did not

know anything about a court of law and ended the call anyway. A few days later, the

Plaintiff received a DMB statement, and DMB had taken off approximately $550 back

dated to February 2003. Notwithstanding that February 2003 was near the time DMB

closed the 8226 account, February 2003 was an inconsequential and meaningless point of

reference, and improperly left $1400 remaining in the account balance, NOT including

the accrued interest on the APP fees, finance charges, and miscellaneous fees which in

sum equals $3500 for services DMB never performed. DMB is not actively trying to

collect any sum under the 3525 account. Although DMB allegedly hired Mann Bracken

to sue the Plaintiff for its debt, DMB never claimed that any amount was due under the

3525 account even though Mann Bracken admitted the existence of both accounts in its

court filings. HSBC, and not DMB, claims today that nearly $3500 is outstanding as

charged off bad debt. DMB and HSBC have defamed the Plaintiff's credit report in order

to block the Plaintiff's attempts to obtain credit with other financial institutions.

**DMB's Flawed Internal Controls Were Meant to Conceal Widespread Clerical Errors and Corporate Deceit**

45.     Companies rarely grow effectively without a well-conceived strategy and

supporting internal controls. Leading companies invest inordinate time, energy, and

18

financial resources to develop internal controls.  DMB did not.  DMB's failure to do so

resulted in creased costs for its customers.  For example, DMB would improperly credit a

payment to the wrong account and fail to detect the error.  In August 2004, the Plaintiff

called DMB to report such an error. The DMB rep stated that the Plaintiff was merely

giving "hearsay" and that the Plaintiff had to fax a copy of the check to DMB.  The

Plaintiff did so.  However the Plaintiff went on to say that DMB had no idea whether or

not any of customers had bank accounts that allowed for electronic review of checks and

statements, and that in effect DMB was outsourcing its managerial responsibilities to its

customers.

46.     DMB's account management systems rely too heavily on manual intensive

process to upload consumer information.

47.     DMB did not have in place a uniform corporate policy regarding specific journal

entry authority – other than for unscheduled journal entries.  DMB did not have a

standard filing for journals and account reconciliations.  In fact, DMB stated to the OCC

"that it did not reconcile information between accounts."  That statement was in fact a lie,

as DMB's collection department reconciles information across accounts to reach and

prosecute account holders designated as delinquent.  DMB under its December 2004

letter, written by Wendy Cosme, to the Plaintiff admitted that DMB reconciled

information between the Plaintiff's account when it closed the 8226 account out of

retaliation for the Plaintiff's billing error dispute.  That admission of misconduct was

among other things, in bad faith, breach of the DMB credit agreement, and contravened

the sprit and letter of Reg Z.

48.     DMB does not have in place a document retention policy to retain and maintain adequate supporting documentation necessary to explain journal entries and to inform consumers/ card holders about account actions.  In the dispute, it was clear that neither, DMB nor Mann Bracken could produce or re-create the necessary documents and accounts journals because of a lack of sufficient documentation.

49.     No formal training program – DMB employees often demonstrated a lack of understanding of finance and similarly demonstrated that they did not understand the technical math, general mechanics, and product knowledge of DMB offerings like APP and just the imposition of fees and interest.

50.     Corrections of reconciling account items and other adjustments were not centrally monitored.  It took DMB nearly three to respond to the Plaintiff's dispute which was sent by regular mail, fax and communicated by phone.  DMB was under the control of a OCC Consent Order to maintain an oral complaint system.  DMB did not honor that agreement at all and never informed its customer base of the existence of its regulatory responsibility.

51.     In sum, best practices require that journal entries are prepared by knowledgeable personnel, are independently reviewed, validated, and properly recorded.  Even more critical is the independence of the employees performing the key steps.  Again, DMB, owned APP by way of Metris, and thus any problem with APP was in fact a problem with DMB.  APP employees worked in the same building and space as DMB.  Again DMB was APP, hence DMB could not and did not take an objective position against itself. Especially since, getting APP to admit that is erred was to convince the DMB had erred, and DMB was deliberately not performing the APP service because DMB was loosing

substantial income due to 9/11's adverse impact on the economy and the record setting

recession that was gripping America during 2001 thru 2002.

Another critical control that DMB lacked in its journal entry process was supporting

documentation that should have been maintained to document the reason for DMB's

inconsistent and self-serving journal entries, and the various DMB personnel involved in

authorizing and executing entries. If DMB did have such basic policies in place it would

have never had any information gaps as it began to claim in 2005. Instead, if there was

ever any information gap as DMB claims, it would have been detected when it happened

and DMB would requested the information, or more efficiently it would have simply

made a copy of the documentation it had for the 8226 account as the documentation was

the same proof. Moreover, DMB's definition of supporting documentation falls short of

all the analysis performed to determine that an entry was necessary, as well as, the

required signatures or assents of the preparer, reviewer, and the authorizer of the entry.

DMB was a wholly owned subsidiary of Metris, a publicly held corporation that was

subject to both formal audits and Sarbanes Oxley controls. Metris' auditors frequently

cited Metris for failing to implement adequate internal controls.

Lastly, DMB segregated its customer service and APP operations from its

collection department. The collection department however had the final say in the

manipulation of the billing statements with respect to the APP service. In other words,

regardless of what clear understandings the customer service and APP operations held,

the collection depart by virtue of being separate could veto or flatly ignore the record and

make its own journal entries for the purpose of collection. In this sense, DMB's flawed

internal controls stripped APP service of its value and DMB's customers, including the

Plaintiff, did not realize this until DMB had charged over $7000 to both cards yet DMB never performed the service as promised.

**DMB's Credited Itself Revenues For Its APP Service Before It Earned Them and DMB Credited Itself The Revenue For Its APP Service After Its has decided Its was Not Going To Perform the APP Service**

52.     One of the first rules, of finance is that there no money trees. DMB however, was seeking to change that truism. By controlling the billing of the APP service, the performance, and the administration of the credit card account, DMB could rig the outcome. In the Plaintiff's 3525 account, DMB began refusing to administer the APP service, but still charged the Plaintiff's account for the service. This practice went on for 25 months ending in July 2004, when the Plaintiff engaged the OCC to settle the billing error dispute, when it was clear DMB was not going to investigate and impeach itself for any wrongdoing.

53.     Under the APP service, the cardholder is not liable for any interest, fees or minimum payments while the APP benefits are active. Even still, DMB charged the Plaintiff's cards during the activation period. By doing so, DMB inflated the balance of the accounts, and demanded that the Plaintiff pay for a breach of contract, or get charged even more and have a superficial balance reported as delinquent to the credit bureaus and thus damaging his credit all the while DMB padded its accounts receivable.

**DMB's Abuse of the Credit reporting System Has Severely Cost the Plaintiff Money and Anguish**

54.     Opportunity cost is truism in economics that states most financial decisions carry mutually exclusion consequences. In this case, the Plaintiff's decision not to play along with DMB's fraud, in which case DMB decided to sabotage his credit in retaliation, cost him over a million dollars. Credit is the life blood of this economy and few things can be

22

obtained without credit.  Moreover, nearly everything life pursuit becomes more

expensive under poor credit, which is exactly what DMB tried to use as leverage to

silence the Plaintiff and coerce him into paying for services he never received as

promised.  Among the many economic injuries are:

 - student loans with an average interest rates of 8%, 13.50%, and 10.5%.  Because of

DMB and HSBC's misrepresentations, the Plaintiff had to use his own cash, borrow

directly from his family, who in turn, liquidated portions of the retirement savings to pay

for law school.  The Plaintiff's mother liquidated over $15,000 in equity holdings during

2003 and 2006.  The same was one of best bull markets in history and the $15,000 also

represents lost profits that would have been realized but for the DMB and HSBC's

scheme to injure the Plaintiff.  The estimated amount of interest to be repaid is $60,000.

Were it not for DMB's damaging the Plaintiff's credit, that interest figure would be 30%

less, and the Plaintiff's family would not have had to cosign the loans.

- car loans: the Plaintiff purchased a Nissan Maxima.  He financed the purchase under a

18% loan from Wells Fargo.  But for DMB's fraud, that loan would have been near 6% at

the high end.  In total, the Plaintiff paid for car twice over.

 - credit repair firms and debt assistance plans – both add to the cost of the debt, as they

offer consumers ill advised promises to somehow minimize the cost of the debt or

improve one's credit report.  In the end, the consumer finds out that credit companies are

well prepared to deal with these firms and the alternative is not a realistic nor cost

efficient one.  In this case, DMB frauds would have been the problem regardless of

whether the credit repair and debt assistance firms had been any good or not.

- denied credit. The Plaintiff will produce the numerous rejection letters for both business and consumer loans. Credit is an essential factor in purchasing a home. In 2002, 2003, and 2007 and 2008. the Plaintiff earns more than enough to afford a $500,000 home. However, due to HSBC misrepresentations on his credit, he can not afford more than a $350,000 home due to interest charged on a subprime loan. HSBC's has refreshed both credit card accounts as outstanding and due. Even though, again according to Mann Bracken, DMB's attorneys, only one account is due.

**DMB Stopped Sending Account Statements and HSBC has Never Sent A Billing Statement Concerning Either Account**

54 (a). DMB stopped sending billing statements in May 2005, however, the balance due as claimed by Mann Bracken has grown by nearly $250. HSBC still reports the accounts as due on the credit report, but has never sent any billing statements or any correspondence in general concerning either account.

Under TILA §226.5 (2) Periodic statements. (i) The creditor shall mail or deliver a periodic statement as required by 226.7 for each billing cycle at the end of which an account has a debit or credit balance of more than $1 or on which a finance charge has been imposed. A periodic statement need not be sent for an account if the creditor deems it uncollectible, or if delinquency collection proceedings have been instituted, or if furnishing the statement would violate Federal law.

(ii) The creditor shall mail or deliver the periodic statement at least 14 days prior to any date or the end of any time period required to be disclosed under §226.7(j) in order for the consumer to avoid an additional finance or other charge. 10 A creditor that fails to meet this requirement shall not collect any finance or other charge imposed as a result of such failure.

**Mann Bracken**

55.     In the Spring of 2005, the Plaintiff sent DMB another billing dispute notice about erroneous charges on the two credit card accounts. DMB, did not perform any investigation, nor did it carve out the disputed amount from the balance. Instead, DMB

24

sent a form letter stating that it was sending the 8226 to a collection agency.   DMB
never responded to the dispute notice in any other fashion and it continued trying to
collect the entire balance while adding interest and fees.

56.      In the Summer 2005, Mann Bracken's Atlanta office called the Plaintiff's
grandmother and left a disturbing message to the effect that the Plaintiff owed a debt and
had to call their office right away.   In response, the Plaintiff sent Mann Bracken, via
FedEx Overnite, a debt dispute letter and requested that no more call be made to his
grandmother, nor him.  DMB continued to send dunning letters.  The Plaintiff replied, by
certified mail receipt, telling Mann Bracken that the account was being disputed and that
there was no balance due and that they had no right to collect as DMB failed to perform,
adhere to the billing rights summary of its agreement, and violated Reg Z generally and
any lawsuit to circumvent its legal obligations would constitute a breach of the credit card
agreement.  In January or February 2007, Mann Bracken filed a claim in the Small
Claims Court of the District of Columbia to collect $3500 from the Plaintiff concerning
the 8226 credit card.  Mann Bracken named Direct Merchants Credit Card Bank of
Georgia, N.A. as the Plaintiff.   Mann Bracken did not mention, nor include any amount
related to the 3525 account.  Mann Bracken continues to purport that DMB is its client
and is the real party at interest in its claim.

56.      On May 2006, Mann Bracken sent the Plaintiff a dunning letter and a consent
agreement to begin paying installments on the 8226 account only.  In the body of the
letter, Mann bracken stated I "was probably aware" of the lawsuit it had filed against me.
The court record shows that Mann Bracken tried to prosecute the suit however the Court
dismissed the suit for lack of service.  The Plaintiff did not receive any notice about

Mann Bracken's suit prior to the May 2006 letter. The letter, among other things violates the FDCPA as it was misleading and calculated to scare the Plaintiff into signing the consent agreement.

57.     On another occasion, in 2006, Mann Bracken's lawyer, Andrew Lerner, in the small claims hallway, just outside of the small claims clerk's office, threatened to call the Marshall "and have his ass kicked…" The Plaintiff again considered his options to protect himself, as he is nearly a foot taller than the Mann Bracken attorney, but decidedly walked away and avoided escalating the conflict.

58.     In 2007, after a hearing, Mann Bracken's lawyer, Andrew Lerner, in the small claims hallway, just outside of the small claims clerk's office, told the Plaintiff that he had no right to appeal and that he had "better pay [him]."

59.     In 2005,

60.     In

61.     Section 1692e of the FDCPA prohibits a debt collector from using any false, deceptive, or misleading representation or means in connection with the collection of any debt, including false representations. See 15 U.S.C. § 1692e(3).

62.     The FDCPA was enacted by Congress due to the overwhelming evidence that debt collectors were undertaking "abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). Moreover, Congress took notice of the subversive effects of these improper debt collections. In particular, Congress was concerned how improper debt collection tactics led to "personal bankruptcies, marital instability, job loss, and to invasions of individual privacy." *Id.* In as much, the FDCPA is a remedial statute and ought to be analyzed from the "least sophisticated debtor."

26

63.     Thus, if a collection letter purports to state that a person is being sued, then a

lawsuit must in fact be active and not deficient in a material respect such as never been

served or disclosed to the defending party.  Sending a collection letter to an

unsophisticated consumer is certain to create deep anxiety, concern and fear.  To suggest

that Mann Bracken does not take this calculated gamble to snare unwary consumers into

paying a debt they may not have to pay if they had competent legal advice is

disingenuous.  Mann Bracken's letter is probably one of many sent to DC residents who

are presumed to be economically disadvantaged and thus also presumed to be

unsophisticated.  See *Wilson v Quadramed Corp.*, 225 F.3d 350, 354 (applying the

perspective of the least sophisticated debtor § 1692); *Graziano v. Harrison*, 950 F.2d

107, 111 (3d Cir. 1991) (the FDCPA is interpreted from the perspective of the "least

sophisticated debtor.")

64.     Mann Bracken's letter was likely a mass produced form dunning letter.

However, Scott Kramer and Andrew Lerner did sign the letter.  It is disingenuous to think

that neither knew the complaint was dormant and was set aside by the Court for want of

service.  Even still, being diligent is critical to an attorney's work.  If these attorney's

plum forgot to check their case file or were comfortable gambling that the Plaintiff would

not notice that he had never been served, the penalties under the FDCPA surely apply

here.

65.     Mann Bracken's letter created a false and misleading impression in the Plaintiff,

and thus violates §1692e(3) of the FDCPA.

### **Count I - Fraud**

27

61.     Fraud is defined as any device, scheme, or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise, or unconscionable contractual provision.

62.     By reason of the acts and practices described above, DMB, HSBC, and Mann Bracken repeatedly and persistently engages in fraud in the operation of its credit card business and debt collection practices.

63.     By reason of the acts and practices described above, DMB and HSBC repeatedly and persistently engages in fraud in the operation of its APP program.

64.     By reason of the acts and practices described above, DMB and HSBC repeatedly and persistently engages in fraud in the operation of its billing and collection practices.

### Count II – Bad Faith, Unfair Dealing and Deceptive Business Practices

65.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC repeatedly and persistently engages in bad faith, unfair dealing and deceptive business practices in the operation of its credit card business.

66.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC repeatedly and persistently engages in bad faith, unfair dealing and deceptive business practices in the operation of its billing, accounting and collection practices.

67.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC repeatedly and persistently engages in bad faith by unreasonably withholding APP program benefits due under the policy.

68.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC repeatedly and persistently engages in bad faith by failing to act fairly and in good faith in discharging its contractual responsibilities.

69.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC repeatedly and persistently engages in bad faith by refusing without proper cause, to compensate and generally protect the Plaintiff's credit cards, as the insured under its APP agreement, for a loss/event covered by the APP policy.

70.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC repeatedly and persistently refused to perform under the APP program based on its erroneous and self-serving understanding of the facts.  DMB and HSBC refused to readdress its records even though it was notified of how its record was inconsistent with irrefutable objective facts.  DMB and HSBC denied its APP benefits and to generally correct its billing errors in order to build a case to deny the Plaintiff's APP claims.

71.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC overzealously and deliberately misinterpreted its records and policy provisions for the purpose of defeating the Plaintiff's coverage.

72.     Consequently, DMB and HSBC as a result of assuming control of DMB, engages in repeated and persistent bad faith, unfair dealing and deceptive business practices.

### Count III – Unlawful Collection Practices

73.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB, HSBC and Mann Bracken knowingly collected, attempted to collect, asserted a

29

right to a collection fee, attorney's fee, or court cost when such charges were not justly due, nor legally chargeable against the debtor.

74.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC communicated the nature of its consumer claim to the Plaintiff's employer prior to obtaining a final judgment against the Plaintiff.

75.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC disclosed derogatory and misleading representative information concerning the existence of a debt known to be disputed by the Plaintiff—debtor- without disclosing that fact.

76.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC communicated with the Plaintiff and his family with frequency and at unusual hours in order to abuse or harass the debtor.

77.     By reason of the acts and practices described above, and in paragraphs 1 thru 65, DMB and HSBC closed the Plaintiff's accounts to injure his credit even though DMB and HSBC knew or had reason to know that it did not have the right to do so since the Plaintiff was waging a billing error dispute in good faith under Regulation Z.

78.     Consequently, DMB and HSBC as a result of assuming control of DMB, engage in repeated and persistent illegality.

### Count IV – Breach of Contract and Violation of Regulation Z

79.     Plaintiff hereby realleges Paragraphs 1 thru 60 and incorporates the same by reference as though they were fully set forth herein. DMB willfully caused injury to the Plaintiff by, among other things, failing to adhere to its Billing Error Procedures, in

particularly the "Customer Complaint Procedures and Billing Dispute" clauses of its credit agreement and Regulation Z.

80.    DMB failed to carry out it responsibility to promote and produce accurate and honest billing statements as an ordinarily prudent company and thus violated the credit agreement.

81.    DMB's fraud was a violent breach of the contract and thus precludes DMB and, or HSBC and, or Mann Bracken, as a buyer of the account, from trying to enforce any rights under its credit agreement.

82.    DMB's willful misconduct has proximately caused injury to the Plaintiff in that his credit report is severely impaired which has substantially increased of all aspects of his life and has done so for five years.  The Plaintiff has lost money on investment opportunities and the opportunity cost of paying for the APP premiums only to suffer DMB breaching the contract.

83.    DMB breached the customer agreement and Regulation Z by failing to respond to the dispute within the 30 day timeframe as proscribed under the statute.

### Count V –Violation of Maryland's Consumer Protection Act

84.    Plaintiff hereby realleges the above Paragraphs and incorporates the same by reference as though they were fully set forth herein. Maryland's Consumer Protection Act ("MCPA"), Commercial Law Article § 13-101 et seq., prohibits unfair or deceptive trade practices, and enumerates included categories of misrepresentations and failures to disclose. The MCPA's purpose is to "take strong protective and preventive steps... to assist the public in obtaining relief from these practices, and to prevent these practices from occurring... and thereby maintain the health and welfare of the citizens of the

31

State." Sections 13-102(a)(3), 13-303. To that end, MCPA neatly applies to the Defendants fraudulent business practices. The Defendants willfully, or in the alternative negligently, caused extreme injury to the Plaintiff by, but not limited to, billing the Plaintiff for illusory services that 1) were never perform as promised, 2) never performed - nor did the defendants offer any *real* consideration to support the APP/cardmember agreement and the direct and collateral fees that the seek to collect Defendants and report as due, but "charged off," on the Plaintiff's credit report.   More importantly, the Defendants acts of bad faith and omissions nullified the APP insurance for which the Defendants seek to collect.   The Defendants circumvented the consumer complaint process in order to pursue their profit motives via improper business practices.

85.    The MCPA is based on Maryland's General Assembly finding that "there has been mounting concern over the increase of deceptive practices in connection with sales of merchandise, real property, and services and the extension of credit" (section 13-102(a)(1), (b)(2)); and "that the doctrine of caveat emptor had outlived its social utility..." The MCPA intent is 1) "to equalize the balance of power between consumers and providers of consumer goods and services," *Hallowell v. Citaramanis*, 88 Md. App. 160, 165, 594 A.2d 591, 593 (1991), aff'd, *Citaramanis v. Hallowell*, 328 Md. 142, 613 A.2d 964 (1992); and, 2) to create a more effective remedy for consumers because the existing consumer protection laws were deemed to be "inadequate, [and] poorly coordinated...". Section 13-102(a)(2); Citaramanis, 328 Md. at 150, 613 A.2d at 970; *Forrest v. P&L Real Estate Investment Co.*, 134 Md. App. 371, 386, 759 A.2d 1187, 1195 (2000).  More importantly, MCPA claims do not require proof of intent to deceive or defraud. Golt v. Phillips, 308 Md. 1, 10, 517 A.2d 328, 332 (1986); accord, *Legg v.*

32

*Castruccio*, 100 Md. App. 748, 761, 642 A.2d 906, 912 (1994). See also *Citaramanis*, 328 Md. at 154, 613 A.2d at 970 ("a remedy to the consumer for many forms of misrepresentations not covered by the traditional theories of tort liability for deceit..."). And most importantly, the MCPA is to be "construed and applied liberally to promote its purpose." Section 13-105. To that effect, the Defendants use fraudulent and unlawful trade practices by offering its APP program, charging premiums for the same, tacking 30% or greater interest thereron, and yet refusing to provide the APP service thus failing to deliver on its $3000 promise, notwithstanding the $8000 interest that compounded thereon, to 1) freeze payments due, 2) protect the Plaintiff's credit rating with respect to DMB, and 3) preserve the Plaintiff's cash flow. As such, DMB's APP did not provide the main ingredient of the APP's "peace of mind" benefit nor the quality represented to the Plaintiff as it DMB took in the APP premiums.

86.      The Defendants are engaged in a scheme to attempt to coerce the Plaintiff to pay off the 8226 account for DMB's benefit even though DMB is not a business entity. Mann Bracken filed a lawsuit on behalf of DMB only. Mann Bracken denies any dealings or acting on behalf of HSBC. To purport as much violates the MCPA, as DMB has no legal existence as a corporate entity recognized by any state. DMB does not have a federal tax ID. DMB does not have any existence apart from HSBC. Yet Mann Bracken, against the clear weight of incontrovertible evidence, insists that it has a right to sue the Plaintiff on behalf of Direct Merchants Credit Card Bank. Mann Bracken, recently tried to garnish monies from the Plaintiff on behalf of "Direct Merchants Credit Card Bank. Again DMB does not exist, nor does business under any such name. If any party should exist as the real party, it is either Mann Bracken or HSBC. However,

neither claims to be the party. To the extent Mann Bracken purports to represent the rights of a nonexistent corporation and collect a debt on behalf of the same is fraud under the MCPA. And HSBC has conspired to further Mann Bracken's scheme, although, it appears that a few HSBC employees are acting for personal gain, and that HSBC's managerial leadership is unaware of its employees scheme with Mann Bracken.

### Count VI –VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT 15 U.S.C. § 1692 et seq.

87.   Plaintiff hereby realleges the above Paragraphs and incorporates the same by reference as though they were fully set forth herein. The foregoing intentional and negligent acts and omissions of Mann Bracken constitute a violation of the FDCPA including, but not limited to, each and every one of the above-cited provisions of the FDCPA, 15 U.S.C. § 1692 et seq. As a result of Mann Bracken's violations of the FDCPA, Plaintiff is entitled to statutory damages in an amount up to $1,000.00 USD pursuant to 15 U.S.C. § 1692k(a)(2)(A); and, reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3) from the Defendant herein.

### Count VII –Defamation and Tortious Interference With Contacts

88.   DMB offered multiple credit cards to its cardmembers. The Plaintiff held two credit cards with DMB and was charged APP premiums on both. When the Plaintiff began to dispute the numerous errors on the 3525 account, DMB attacked the 8226 to coerce the Plaintiff to abandon his dispute and pay for the APP service even though DMB refused to perform. Under Reg Z, DMB was prohibited from taking any retaliatory

34

action against the Plaintiff for waging a good faith dispute of DMB's business practices. DMB closed both accounts during the dispute, never investigated the dispute within the required response time under Reg Z, as to do so would require DMB to incriminate its own accounting and record keeping. Rather DMB closed the accounts and began to inflate the balances on both accounts to ruin the Plaintiff's credit profile. DMB had a credit department and was fully aware that closing the accounts not only frustrated the value of its APP service, but also blocked the Plaintiff from obtaining additional sources of credit. DMB's fraud cost the Plaintiff's thousands in interest. And cost millions the Plaintiff millions in terms of precluding him from obtaining a mortgage, car loans, student loans, employment, educational pursuits and nearly every endeavor that hinges upon the ability to borrow. DMB's sabotage does not limit itself to the Plaintiff as it runs to the Plaintiff's family and the economy at large much like the present day mortgage debacle where a credit bubble formed due to speculation based on misinformation and fraudulent business practices.

89.     After its acquisition of Metris and DMB, HSBC was contacted by the Comptroller of the Currency to provide information for its investigation. HSBC never responded. Today HSBC however, sends information to all three credit reporting agencies stating the Plaintiff owes a debt on both credit cards. Yet HSBC has never sent a statement or contacted the Plaintiff concerning the 3525 account. And Mann Bracken incredulously claims to represent DMB to collect on the 8226 account.

90.     In 2007, the Plaintiff applied for several mortgages and was only offered a subprime mortgage. Every mortgage underwriter cited the HSBC credit lines as the reason for disqualification for traditional and an affordable mortgage.

91.     In 2007, the Plaintiff purchased an automobile and was offered a high interest

loan. The lender cited the HSBC credit lines as the reason for the loan being priced

above a reasonable interest rate.

92.     In 2007 and 2008, however, HSBC has sent the Plaintiff solicitations to open new

credit card accounts and to refinance his car loan.  In its offer, HSBC states:

"Dear Gregory Milton, because you've done an outstanding job managing your credit,
you've been pre-qualified for this offer to refinance your auto loan with HSBC.  When
you refinance with HSBC, you may be able to:
-   **reduce your interest rate by an average of 3.89%**
-   **lower your car payment amount**
-   **skip your next car payment***
-   **Enjoy more financial freedom**
The HSBC footnote reads - * Based on an average existing loan with an initial principal
balance of $20,000 payable over 5 years at 17.35% APR in equal monthly installments of
$500.82, which is refinanced after 12 months at 13.46%......

HSBC's offer is an offer for the Plaintiff to rob from himself and give to HSBC.  The

Rule of 72 is shorthand method to determine how long it takes for an investment to

double its return – simply put, earning a 100%.  So under the 17.35% APR, a borrower

will pay the loan amount twice over in 4 years.  Under the 13.46% it will take 5 years for

HSBC to double its investment.  HSBC expects that the borrower who considers this

loan, does so because that borrower has no cheaper place to go.  HSBC also deems that

this kind of borrower is unsophisticated.  By tacking onto DMB's fraudulent scheme to

misrepresent that the Plaintiff has delinquent debts, and that DMB properly closed the

accounts, and that the *debts* are outstanding, HSBC makes the Plaintiff a captive client by

making his credit profile untouchable to all other creditors.  This economic injury is

ongoing and is compounding making the Plaintiff's life more burdensome.

93.     As a result of the Defendants various schemes to assault and batter the Plaintiff

economically and psychologically, as well as to indirectly injure the Plaintiff's family,

the Plaintiff has had to forfeit a substantial portion of income to pay for high interest costs for ordinary expenses. That forfeited income is the rightful property of the Plaintiff and his family. By reason of the foregoing, the Defendants are jointly and severally liable for not less than $1 million for interfering with the Plaintiff's current and future credit expectations to enter into credit based ventures that are reasonably expected to be available for the Plaintiff but for the DMB and HSBC misrepresentations on his credit report.

94.     Because of the negligent, and, or willful, wanton and intentional nature of defendants' conduct, they also are liable for punitive damages in an amount to be determined at trial.

### Count VIII –Interference With Business Relations (against all Defendants)

95.     The Plaintiff repeats and alleges the above paragraphs as if fully set forth herein.

96.     HSBC and DMB's defamation of the Plaintiff's credit affects his professional and business pursuits and interests just as profoundly. The Plaintiff went to law school in 2003 – 2006. The Plaintiff had to spend his IRA to fund part of the cost of that education. Due to HSBC and DMB, the Plaintiff could not get private loans without a cosigner. The interest rates on those loans are far above what they would have been but for HSBC and DMB's fraudulent business practices.

97.     HSBC and DMB defamation is slander of the Plaintiff's credit and has disqualified him from securing loans for business pursuits. HSBC and DMB sought to injure the Plaintiff's credit in order to interfere with and destroy any business relation he might pursue. HSBC's and DMB's interference is ongoing and never stopped since 2002.

98.     By reason of the foregoing, defendants are jointly and severally liable for interfering with the Plaintiff's business relations in an amount not less than $1 million, the exact amount to be determined at trial.

99.     And because of the negligent, and, or willful, wanton and intentional nature of defendants' conduct, they also are liable for punitive damages in an amount to be determined at trial.

### Count IX – Defamation per se, Defamation and Injurious Misrepresentations – against all Defendants

100.    The Plaintiff repeats and realleges the above paragraphs as if fully set forth herein.

101.    In 2002, the Defendants, save for Mann Bracken and HSBC, acted to defame the Plaintiff by reporting his 3525 credit card as delinquent even though Metris and DMB had agreed under the APP service not to report the account as late.  More bizarre is the fact that Metris and DMB charged the Plaintiff nearly $30 for the APP service and then refused to perform all in the same billing period.  This practice went on for nearly a two years.

102.    HSBC tacked onto Metris's and DMB's scheme and continues to report the cards as delinquent in the past, that they were closed by DMB in good faith when in fact DMB closed the accounts in utter bad faith, and that DMB earned the APP fees and that the balance is accurate, outstanding and still due.

103.    Mann Bracken has sought garnishment proceedings on behalf of DMB when in fact DMB does not have any legal existence.  Mann Bracken has stated that HSBC is not associated with the debt collection, when in fact a HSBC employee has been involved in the small claims court litigation.  Mann Bracken claims that only $3478 is due versus

38

HSBC claims that the Plaintiff owes over $7000. Mann Bracken claims that all of the transactions supported the debt are authorized charges versus DMB who admitted that is never earned the APP fees, and that Metris, according to its 10K treat the APP fees as deferred income until it is earned -- yet, DMB treats the fees as immediately earned and will include the fees in the interest calculations and will tack on miscellaneous and penalty charges.

104.    Mann Brackens and HSBC s statements listed above and described throughout this pleading are false and were known, or should have been known, by defendants to be false. The Defendants, save for Mann Bracken, were not privileged to make false and inaccurate representations on the Plaintiff's credit report. On the other hand, all of the Defendants unlawfully disparage the Plaintiff's financial integrity, and his ability to function productively as a lawyer, and are calculated to cause injury to Plaintiff's profession and personal life.

105.    As a result of defendants' defamatory statements, the Plaintiff has had to take on burdensome obligations and undertake extreme measures to make a living due to the Defendants.

106.    By reason of the foregoing, the defendants are jointly and severally liable for defamation *per se* and defamation, and injurious misrepresentation, in an amount not less than $1 million, the exact amount to be proven at trial.

107.    Because of the negligent, and, or the willful, wanton and intentional nature of defendants' conduct, they also are liable for punitive damages in an amount to be determined at trial.

39

**WHEREFORE**, the unpaid charges on the account balance are the direct and collateral result of the Metris', DMB's and HSBC as the successor in interest, APP service which was never delivered by DMB and Metris as promised; and since the Plaintiff's credit card was used to order the APP service, the Plaintiff was entitled to assert the defense of non-delivery against Metris and DMB in its action to recover the balance due on the credit card accounts. There is irrefutable and substantial evidence in support, and the Plaintiff's claims fall squarely within the purview of the provisions of Regulation Z, the MCPA, and the Truth-in-Lending-Act, 15 U.S.C. 1601, *et seq*.  HSBC, is the successor in interest, and actually runs a cleaner and more efficient credit card business than DMB, however, HSBC is the assignee of DMB's troubled business and is subject to the Plaintiff's claims in recoupment against DMB, as is Mann Bracken, given that DMB violated Reg Z when it sold the account to Mann Bracken  - *Article Nine of the Uniform Commercial Code*. And Mann Bracken does not represent DMB as DMB is nonentity without the capacity to create contractual relationships, let alone an attorney – client one.  Accordingly, the Plaintiff respectfully request that this Court:

- To permanently enjoin Mann Bracken, Metris, DMB and HSBC and any other entity thru which they may act, from engaging in the fraudulent, deceptive and illegal practices  alleged herein;

- 

- Order DMB, Mann Bracken, Metris, and HSBC to make full monetary restitution and pay damages to the Plaintiff;

- Order DMB, Mann Bracken, Metris, and HSBC,  jointly or severally, to pay consequential damages in the sum $1,000,000 to the Plaintiff;

40

- Award the Plaintiff the costs and disbursement of this action and the action in small claims court;

- Grant the Plaintiff such other and further relief as this Court deems just and proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury of this matter.

Respectfully Submitted,

By:
Greg Milton, Esq.
1101 Elmcroft Blvd
Rockville, MD 20850
202-352-8885

Dated: January 31, 2008

41

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was mailed, via CERTIFIED RECIEPT

mail, on January 31, 2008 to:

| Mann Bracken | HSBC's Principal Office |
|---|---|
| 1953 Gallows Road, Ste 240 | 2700 Sanders Road |
| Vienna, VA 22182 | Prospect Heights, IL  60070 |

| | HSBC's   - Resident Agent |
|---|---|
| | The Corporation Trust Inc. |
| | 300 E Lombard Street |
| | Baltimore, MD 21202 |

Greg Milton, Esq.
1101 Elmcroft Blvd
Rockville MD 20850
202-352-8885